Good afternoon, Illinois Appellate Court, 1st District Court is now in session, the Sixth Division. The Honorable Justice Mary Mick for presiding, case number 1-9-0-9-8-6, People v. Tyrone Clay. Good afternoon, counsel. I know Ms. Ferozzi knows this because she has just argued a case before us five minutes ago, but for Ms. Isaacson, just to let you know how we're going to proceed today, we're going to have about 10 minutes of uninterrupted time. Ms. Ferozzi, if you want to save some of that time for rebuttal, you may do so. And then we will turn it over for questioning, first to Justice Harris, then to Justice Connors, and then to me, just so we don't all interrupt each other. So would you like to save some of your time, Ms. Ferozzi, for rebuttal? Yes, I would. How much time? I'm sorry. How much time? How much time? I've been, as you could tell from the last argument, a little generous, but approximately 10 minutes of uninterrupted time. Would you like to save some of it for rebuttal? Yes, I'll save two minutes for rebuttal. All right. And would you both state your name and who you represent for the record before we start? Sure. Assistant State's Attorney Iris Ferozzi for the People. Assistant Public Defender Suzanne Isaacson for the Appellee Tyrone Clay. Okay. All right. Ms. Ferozzi, whenever you're ready. Yes, Your Honors. May it please the Court. My name is Assistant State's Attorney Iris Ferozzi here on behalf of the People. We are, this is a state appeal challenging the trial court's ruling on suppressing statements of Tyrone Clay and granting a motion to suppress statements. Your Honors, the electronically recorded interview makes clear in this case that there was no coerced choice on behalf of defendant when he waived his Miranda rights. There were no physical abuse or threats on behalf of the police. He was not promised anything in return for his statement. He was provided with food and breaks and naps, and he was in custody for 22 hours, but there was no indication of any unreasonable delay. He did establish or show the requisite level of comprehension that was required for him to waive his Miranda rights, which would be, he was advised of his Miranda rights three times throughout the course of the police questioning. At the time he was 29 years old and was married with children. He had finished some high school and had been arrested at least 10 times and knew his Miranda rights since he was 21 years old. The video shows a coherent defendant who is responsive and indicated numerous times that he understood his rights and has also made comments about knowing his rights, that he wasn't a little boy or rookie and he had been in and out of the system and that he had beaten cases before and he would beat this one. This is buttressed by Dr. Frumkin's testimony of intelligence testing that he would find it was given over the course of two different dates. Most glaringly is that the first time he took them, he lied on them to appear more unintelligent because he was told that that's a good way to go to get his statement thrown out. So Dr. Frumkin gave him tests again and then in his testimony stated that that defendant stating his rights or understanding his rights three times on the video had no meaning, had no effect because defendant could not make the connection that he could stop speaking with the police when he wanted to and that his criminal history had absolutely no significance and had no bearing on his ability to knowingly and intentionally waive his Miranda rights. On the flip side, we had Dr. Henry testify for the prosecution. Dr. Henry focused most of his analysis on the adaptive functioning of defendant, not any IQ tests that could be manipulated by the defendant and found that he had normal range of intelligence and the adaptive functioning portion and that he had known his Miranda and that he was not suggestible and that was shown by the inconsistent statements he was given that he was making when he was in custody, the alibi statements and the court ruled, the court's ruling was that, and this was over the course of her initial ruling and then her ruling on the motion to for reconsideration, that the defendant understood the Miranda concepts but didn't know how they actually applied, that his invocations for counsel however were equivocal and the police acted reasonably for continuing and continuing questioning him but also that his will was overborn because of his intelligence and because police continued to question him even though the court ruled that they acted reasonably. The court also ruled that while defendant was not intelligent enough to put together Miranda concepts, I'm sorry, put together how the Miranda concepts applied, the court ruled that defendant was able to invoke his right to silence and then ruled first that the police honored this request and then that they did not. But finally, the court's ruling that was that knowing waiver is different from intelligent waiver and that defendant understood the warnings but lacked the concepts or lacked the intelligence to put the concepts together to stop the police from questioning him. It's our position that the trial court's ruling was an error for several reasons, one being that the court's factual findings placed far too much weight on these intelligence tests where the defendant was found to be malingering, in other words, lying and manipulating the test. This fact alone was enough to show that he was intelligent enough to waive his Miranda if he could manipulate his intelligence tests. And even on the second round of tests that the court relied so heavily upon, the results were contradictory. The 16 PF test was interpreted to mean that he would defend it was not more submissive or accommodating than the average person, and that he gave a lot of adequate responses to the FRI test. Plus, Dr. Frumkin's conclusions were an opposite to establish Illinois precedent when he state when he ruled when he concluded that no weight should be given to the fact defendant understood his rights and that there should be no significance placed on his criminal history. Illinois courts have consistently held that low intelligence is not a roadblock to Miranda. It's just one aspect in the totality of the circumstances and courts should consider other factors like the defendant's age, background, and conduct. So here the trial court placed little to no weight on defendant's age, background, and I would note in the Illinois Supreme Court case of People v. Braggs, where the court ruled that the most telling aspect to the court was the defendant's own conduct and being able to view the defendant's conduct. Here when you view the defendant's conduct, besides the fact that he was read his rights three times and stated he understood, he used sophisticated terms like that he wasn't an to the officers and the detectives, I'm sorry, that he was not an amateur and knew exactly what he was doing and was going to beat his case. And it appears that the court gave very little weight to the entirety of the ERI and defendant's understanding of Miranda and the fact that there was no coercive atmosphere at all during the questioning. So, this incongruity by the court's ruling that he made, defendant made an uncoerced, I'm sorry, let me back up, but the court was only to look at two things, is whether the defendant made an uncoerced choice and whether he had the requisite level of comprehension. And in People v. Bernasco, which is the case I cite to in my brief, this is in the most minimal understanding required. Not what the court ruled that the defendant didn't understand the concepts and couldn't put the concepts together. The court also ruled that the police were not, there was no express ruling that the police were coercive, but yet the court ruled that the defendant's will was overborne based on his intelligence. Again, this is an objective standard based on the reasonable police officer. And there was no outward indication that defendant did not understand. The police knew of his prior contact with law enforcement. And that's a circumstance that is relevant to whether the police acted reasonably. And they could have reasonably assumed that he was capable of making an unequivocal request. There's nothing outward of the way defendant acted or spoke or behaved like the defendant in Bragg's, where they could be, would be alerted to some sort of intellectual deficiency. So the police did act reasonably. And there was no defendant statements, a defendant waived his Miranda voluntarily. So the court also ruled that his waiver was not knowing and intelligent. You have one minute of uninterrupted time. Sorry? About one more minute of uninterrupted time and then. Oh my goodness, I got to fast forward. So I'm going to jump to my argument that the court's ruling was error as a matter of law when she ruled that knowing and intentional are two separate things that the people are and that the court has never ruled that the defendant has to, and these are the court's rules, words, appreciate the significance of his rights, understand how the legal system works, know how Miranda concepts actually apply, and know how to put together the concepts that he could choose not to talk to the police. These are all the court's words. These are not requirements by any court in Illinois. And that's because it could be argued that no waivers are intelligent because a suspect has nothing to gain by waiving his rights. So it has to be, as the Bernasco court showed, knowing intelligent knowledge that is required when waiving. And here, defendant showed time and time again that he did understand his rights when he was repeatedly making his comments about after, for example, the polygraph examiner came in and read him his Miranda rights a second time, he asked the polygraph examiner, if I pass this, they'll let me go, right? And again, that he wasn't an amateur, using somewhat sophisticated language, using the word amateur, and that he had beaten cases before, and that he would get himself a lawyer, and that he knew his rights, and he was innocent until proven guilty in a court of law. The people submit the defendant absolutely knew he could stop talking whenever he wanted to. He just chose not to. And with that, I'll open it up to questions from the court. Sorry if I was talking fast. Justice Harris. Thank you. I don't have any questions. Thank you. Justice Connors. Ms. Rossi, the trial court found that Dr. Frumkin's findings were, in conclusions, were more credible. Is that right? And it went along with him versus Dr. Henry, correct? I don't believe she used the word credibility, but yes, she heavily relied on Dr. Frumkin's testimony, almost exclusively. In resolving contradictions between two experts, the court may accept the opinion of one and not the other, isn't that right? Yes, that's correct. So are you pretty much asking us to reweigh the evidence here in looking at the various conclusions and opinions that the doctors came to? Well, the ultimate conclusion of whether the defendant waived his rights is something that this court may review de novo. It is our argument that the court erred and it was against the manifest way of the evidence because she did not consider other factors and the totality of the circumstances which is required. She based her ruling essentially on Dr. Frumkin's intelligence tests, which this court has held time and time again that IQ and intelligence is but one factor and it's not the only factor. But it appears her ruling was exclusively based on the intelligence testing. Well, are you saying that the opposite conclusion would be apparent or that it was unreasonable, arbitrary or not based on the evidence or findings? I'm saying it's unreasonable and arbitrary because she did not consider the defendant's conduct in the ERI and the video. It's not apparent in the record if she even viewed the video and the court absolutely had the entire ERI video to review and did not consider that. And as the court in Bragg said, that's really the one of the most important things is to look at the defendant's own conduct and the way he's handling himself during an interrogation. Thank you, counsel. Thank you. I think I may have misunderstood you, but I thought at one point you started talking about what a reasonable police officer would think. But the question of whether it's a knowing and intelligent waiver, which is what is before us, that's not a determination, is it for the police officer? That's a determination for the court. Well, right. I was talking about that in regards to the court's ruling that defendant's will was overborne, even though she stated also that the police acted reasonably, that it is a contradiction in terms. So that's, and I just said it would be based on what the reasonable belief of the police officers and that there was no outward indication that defendant did not understand his rights. So it was reasonable for them to keep talking to him. Okay. All right. But that wasn't the basis for her ruling that they acted unreasonably. The basis for her ruling was that his waiver wasn't knowing and intelligent. Correct? Correct. But the ruling is very confusing because she also intertwines this will being overborne, but yet doesn't, that factors into the voluntariness of his, and coercion, and the voluntariness of his waiver. So that gets kind of, she talks about his will being overborne, but doesn't make any outward ruling about the police acting unreasonably. So that's, I was pointing that out as being, to show how the ruling kind of mashes together voluntariness with knowing and intelligent, and then separates knowing and intelligent as two separate things that the people need to show. Okay. I think I understand what you're saying. Okay. No. All right. Ms. Isaacson. Okay. Thank you. May it please the court, at the risk of using up too much of the 10 minutes, I did hear several references to the entirety of the ERI. I don't know if this panel is apprised that prior to my briefing file, there was a flurry of motions and responses in which I was objecting to it being part of the record, this entire ERI, as well as the entire transcript of the entirety of the Henry video and transcript of the evaluation. And I do plan to resurrect those. And it's always been my position that it would be appropriate, if the court deems appropriate, to have a remanded proceeding to reconstruct the record properly. It was only that which was admissible. For the state to unilaterally append to a post-hearing motion, a video of the entire ERI does not make it admissible when only admitted is clips actually admitted at the hearing. So with that caution, I would submit that the trial court's decision to suppress Tyrone's statement was absolutely supported by the evidence and factual findings based on the evidence that are entitled to deference for which there was full support in the record of the statements not being, knowing, intelligent, or voluntary. The law requires that waivers be made with full awareness of the nature of the right, the consequences of the decision to abandon it, and what the waiver will entail. This is what the court found was not proved by the state which has the burden. Tyrone's verbal comprehension index was only 66 in the lower 1% of the population. Low IQ has been empirically demonstrated to correlate with low Miranda comprehension. In contrast to Dr. Henry's assumptions about factors such as having been arrested or having heard the warnings before, which have been shown to be not as significant in studies by experts such as Dr. Grissom, cited by Frumkin and with whom he was familiar. While low verbal intelligence is an important factor, neither Dr. Frumkin nor the court relied on that alone. In fact, Dr. Frumkin himself recognized that there was no automatic cutoff below one would be presumed to be incapable of waiving their rights. There were other factors. Tyrone's core working memory in the bottom 6%, which would have made it difficult for him to retain rights as the hours went on in the interrogation. That came out during the testing, where Dr. Frumkin in the function of rights and interrogations spent 45 minutes to an hour discussing the rights. Yet all Tyrone was able to repeat back was the right to silence. Dr. Henry administered no tests. Dr. Frumkin conducted a battery of tests specifically designed to assess Miranda comprehension, the validity of which was not contradicted at the hearing where the results obtained. His performance was poor, indicative of partial comprehension at best, scoring a 50% on the CMR and only slightly better than chance on the comprehension of Miranda rights recognition test. As for the FRI, which assesses intelligent waiver, and which this court recognized in the Daniels case, Tyrone said about the right to silence, you got to talk because if you're silent, they'll still charge you. If the judge finds out you don't talk, something bad will happen. He was unable to identify a certain time period when he could have an attorney, meaning during the questioning. That's exactly what he couldn't grasp, was that he could refuse to talk until an attorney was provided, just as was borne out during the questioning, in which he very much seemed frustrated and didn't want to continue being interrogated. It's one of the first things he said about not wanting to talk with the first warning, yet he couldn't effectively ever invoke his rights and grasp that he could stop talking. Not to mention that his role was overborn when he would say things about a lawyer who's being told that that wasn't an option, in effect, negative teaching of the rights. Even Dr. Henry's summary of Tyrone's understanding of the rights failed to prove comprehension that would be sufficient to be able to show an intelligent waiver of rights. Tyrone told him, Miranda writes, that's something that you have. He said that the purpose of the rights is so you don't do something you ain't got no business doing. That does not furnish sufficient evidence for the state to carry its burden of overcoming Dr. Frumkin's expert opinion that to a reasonable degree of psychological certainty, Tyrone would not have understood the warnings when given. About this knowing versus intelligent difference, it's somewhat of a red herring because Dr. Frumkin and the court both posited that Tyrone's understanding itself of the warnings was poor or partially at best. The court said this in the context of showing why she was deferring to Dr. Frumkin. He was able to cite to specific studies. He was very schooled and sophisticated in this specific area of Miranda waivers. Therefore, was entitled to his deference because he was testing for exactly what the matter at hand was. Dr. Henry relied on adaptive functioning. Dr. Frumkin persuasively testified that its actual verbal comprehension ability that matters for these abstract areas. You can have a variety of abilities. One can be able to do simple housekeeping and run errands or have a friend. That was the case in Daniels. She was a high school graduate with children and a boyfriend and so on, but its verbal comprehension ability is what's more telling. There's the malingering question. Dr. Frumkin recognized it. He called attention to it. He had given specific tests, such as test of memory, malingering and validity indicator profile to recognize it. He believed that Tyrone was not malingering with everything, but was sometimes giving acquiescent answers. He came back. It did not affect Dr. Frumkin's opinion because on the verbal comprehension and memory index scores, he got the same scores during both sessions. He specifically said, Frumkin specifically said he had no doubt that Tyrone was trying to get the Miranda answers right because he touched on the general subject areas, whereas a true malingerer would get more answers wrong and would give answers more off-base. For the very easiest answers on some of the tests, Tyrone got 28 out of 29 right, which a malingerer would not do. Some of the tests were immune to malingering, such as GSS, Good Johnson's Adjustability Scales, because the person being subjected to the evaluation was led to believe that it's actually memory that's being tested for. The argument that Tyrone invoked is right, so he must have understood everything is not well taken. Because he did not invoke his rights right then and there, in a manner that would be suggestive of being advised of the rights, understanding the rights, seizing upon the text of the rights in an effective manner and invoking. Rather, in a vernacular manner, disconnected from the text of the warnings, and later in time, he refers to his desire not to talk again and again and for a lawyer again and again, in a manner disconnected from the warnings and not specifically linked back to them, so as to evince an understanding that they could be given effect. It certainly escaped him throughout that questioning could stop if he said so and just stop talking. Moran versus Burbine and other cases say that the defendant has to have the ability to know that he can stand mute and request a lawyer, and trying to request ham-handedly, even when frustrated, but not standing mute, belies that he understood these warnings. As for- We have about one minute before we're going to turn it over for questions. Okay. We'd also submit that the court also found that it was both an involuntary statement and an involuntary Miranda waiver under state law, as explained in Bernasco and other cases, for an involuntary statement that could be based on a defendant's own personal, psychological peculiarities. He was arrested a little after 4 o'clock in the morning. He was held without any family, without an attorney. The interrogation began soon after 7 a.m. It was still going on 10 hours after the arrest when he was trying to invoke his right to silence. It was still going on 22 hours after his arrest at 2 o'clock in the morning on January 6th. When he talks about getting a lawyer for the last time, he's told you don't have that option. The interrogation continued even after that. That was a factual finding on the part of the trial court. His low educational attainment, not being able to handle the ninth grade, suggestibility, the conduct of the police in negating the warnings by questioning him when he talked on the subject matter that the warnings covered. All of that showed that his role was overborne. Only enhanced even if his request for a phone call came after statements. Many times that was disregarded. I'm going to turn it over to Justice Harris for questions at this point. Justice Harris. Thank you, Justice McFarland. I do not have any questions. Justice Cotters. Counselor, did Dr. Frumkin testify that a waiver must be knowing but not intelligent? No. He did not. I think he gave the standard for knowing. A waiver must be both knowing and intelligent, as does the case. I think he gave some examples of waivers that can be knowing but not intelligent and also intelligent but not knowing. I think he gave an example and he was speaking in like a scholarly sort of educational sense. An airplane pilot has the IQ and the ability under normal circumstances to understand his waivers, but in a particular scenario might be cocaine addicted and not be able to make an intelligent waiver by way of example. I see, but that testimony did not apply to this defendant. Is that what you're telling me? No. My understanding of Dr. Frumkin, including from his report, is that not only was Tyrone not able to understand, he did understand a little bit. He did understand the word, you know, maybe lawyer. He knew what kind of what a lawyer was. He had a lawyer in the past in his cases, but he had neither the understanding nor the ability to intelligently wait. Okay. Thank you, counsel. That's all. Counsel, you've mentioned motions around the ERI being in the record. Are there motions? Are you suggesting there's motions pending in this court? Not anymore. Okay, all right. I think around about February or March or so before the state's brief was filed, I received an impound order where, you know, various things were impounded with the representation that they had been used in the circuit court. And I was trying to object or get the record reconfigured for only actually admitted exhibits to be in the exhibits volume and for public consumption. And then try to work around, given that these things were kind of admitted at the hearing about, well, maybe a common law supplemental can be constructed, even if not referred. But it eventually didn't work. Eventually, everything that was transmitted was things beyond what I believe was properly admitted and properly considered. And everything was before the trial court. It's just some of it was before the trial court on post hearing motions. Is that your concern? Well, flip to a motion, but I don't know if the court looked at these things. Okay. Considered them. No indication in her rulings and ruling on reconsideration. I think the court said, I looked at the clips again. Okay. We looked at and considered everything. And there was a lot of litigation about a motion to strike being granted about the entirety of the Dr. Henry interview. And so it's inconceivable to me that anyone could have agreed for that to have all come in. When that was just shown at the hearing for refreshing recollection. I think just two pages of it. And Council Bellendier was saying when he was in producing clips, clips only of the Dr. Henry interview, which I think that did not make it into the record. I think that is correctly defense group one. He was saying, I'm making these clips very narrow because of the motion to strike that the defense prevailed on. So this is the concern. I think I understand. The other question is your argument that the statements that Mr. Clay made were voluntary. Is that an alternative basis on which you're suggesting we would affirm? Yes. I believe the trial court ruled on it. There's voluntary as a prime of a Miranda waiver can be knowing and intelligent, but not voluntary. That's the third thing that has to be shown for valid Miranda waiver. Then also under state evidentiary law, the statements itself have to be voluntary as well. And I believe that the court that's my reading of her ruling. It certainly was alleged in the motions to suppress. It comes out in the opening statements in the motions post hearing by the state. They acknowledge that it was alleged in that, to my understanding, the judge, as an other reason said, yes, his will was under warning overboard. And then these statements were involuntary. Okay. Thank you. Mr. Rosie, a brief rebuttal. Yes, your honors. With regards to what was admitted at the hearing, I believe I covered that in my reply brief. And I just want to, you know, instead of going through it, just say that, that it could be used against us in our argument. So, I mean, we err on the side of giving the court everything the court trial court did look at the transcript of Dr. Henry's interview and had all of the ERIs and I've cited to the record in my reply brief. And also, you know, defendant, if we're going to believe what Dr. Frumkin's ultimate conclusion was defendant could not knowingly intelligently waive his Miranda rights. And that's because of his, these intelligence tests that he malingered on, meaning lied and cheated on. That's versus Dr. Henry's assessment, which is not based on tests that a defendant can lie on. This is based on questions about his life. The whole fact that, that a confession can be tossed based on IQ testing where a defendant can lie and manipulate it should be a huge red flag and is very problematic in a case like this, especially when the court relied so heavily upon it. And defendant also claims, you know, that if we're going to go with what Dr. Frumkin is saying, then the court's ruling is incongruous because the court ruled that he did invoke his right to silence and counsel argued in her brief that he also invoked his right to a lawyer, to an attorney. So it's asking for both ways that he wasn't intelligent enough to do it at some points, but at some points he was intelligent enough to do it. The fact of the matter is when this court views the entirety of the ERI, as well as the red flags and Dr. Frumkin's analysis and the more concrete and reliable evidence relied upon by Dr. Henry, that the court's ruling, despite those things was manifestly erroneous. And because of the way she applied the facts and the fact that she combined the voluntariness aspect about his will being overborn, which is typically has to do with police misconduct. So I would ask this court to reverse the trial court's ruling on the motion to suppress statements. Thank you. Thank you. Justice Connors, did you have an additional question? You look like you might. Okay. Thank you both very much for an excellent argument, excellent briefs. And we will take this matter under advisement and this court session is hereby adjourned.